Filed 3/30/23

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| SANTA CLARA VALLEY WATER DISTRICT,<br><br>        Plaintiff and Appellant,<br><br>                v.<br><br>CENTURY INDEMNITY COMPANY,<br><br>        Defendant and Respondent. | H047394<br>(Santa Clara County<br>Super. Ct. No. CV286500) |


## I.        INTRODUCTION

Over the years, appellant Santa Clara Valley Water District (the District) had been insured under several primary and excess liability insurance policies issued by respondent Century Indemnity Company (Century).[1]  In August 2000, the District sent a notice to Century that the District had been advised in writing by the United States Department of the Interior's Fish & Wildlife Service (Fish & Wildlife) of potential claims for natural resource damages resulting from mercury contamination in the Guadalupe River Watershed (the NRD Claim).  Century responded that month, requesting the District's assistance by providing additional information, including the status of negotiations concerning the claim and information concerning investigation and remediation of the impacted region.  Century made several similar written requests to the District between

---

[1] Century is the successor to CCI Insurance Company, as successor to Insurance Company of North America (INA), which issued the primary and excess insurance policies to the District at issue in this case.

September 2000 and May 2002. In one such letter in May 2001, Century also advised the District that it (1) had no duties under the primary policies at the time because there was no lawsuit pending, (2) had no duty at the time to indemnify the District under the excess policies unless and until the underlying limits of the policies had been exhausted, and (3) was reserving its rights under the policies. After submitting the NRD Claim to Century in August 2000, the District's only communications with Century about the claim for nearly eight years (until April 2008) were a November 2000 letter sending a copy of a report supporting the NRD Claim, and a June 2002 letter indicating it had obtained coverage counsel.

The claimants, Fish & Wildlife and other entities (hereafter, collectively the Trustees), continued to pursue the NRD Claim against the District and others. At the Trustees' request, the District signed a tolling agreement to forestall litigation and to facilitate additional investigation and negotiations, which continued from 2000 to 2005. During that period, the District, according to its attorney, both "vigorously contested the NRD Claim . . . [and sought] a solution that would limit its potential exposure." Century was not apprised of those negotiations.

On July 28, 2005, the Trustees filed a lawsuit in the United States District Court, Northern District of California (the federal action) in which the District was a named defendant. At that time, the parties, along with the State of California, filed a Consent Decree reciting a prior settlement of the NRD Claim, which had been signed by the District more than two months earlier. Under the Consent Decree, the District was required to undertake specified acts at the site that was the subject of the NRD Claim. The court entered judgment on November 16, 2005, permitting it to oversee enforcement of the Consent Decree. The District did not notify Century at the time that the District had negotiated and executed the Consent Decree or that it had been sued in the federal action.

2

Nearly two and one-half years later, on April 22, 2008, the District wrote to Century of the existence of the federal action and the Consent Decree and stated that it had incurred up to that time approximately $4 million in costs to comply with the Consent Decree. In the letter, the District tendered the NRD Claim to Century under its primary and excess insurance policies.

In July 2008, Century responded to the District, again indicating that it continued to reserve rights under the policies. Century also stated that the policies "may not provide coverage to the extent that the policyholder voluntarily made or makes any payment, assumed or assumes any obligation, or incurred or incurs any expense without our prior consent." Century thus referred to a provision in the insurance policies commonly known as a No Voluntary Payment (NVP) provision. The potential application of this provision is at the heart of the present controversy. Century did not hear again from the District until 2014, the year that it completed its work as required under the Consent Decree.

In October 2015, the District filed the instant action against Century for breach of contract and breach of the covenant of good faith and fair dealing. The District alleged that it had incurred approximately $8.4 million for expenses in complying with the Consent Decree. Century thereafter filed a motion for summary adjudication, which the trial court granted on March 2, 2018. The court determined that because the District had voluntarily assumed the obligations of the Consent Decree, the NVP provisions in the two excess insurance policies considered in the motion barred the District's recovery under those policies.

The District amended its complaint to allege Century's breach of four primary insurance policies and three excess policies. Century thereafter moved for summary judgment; that motion was based primarily on the same grounds asserted in the prior, successful, summary adjudication motion. Century asserted that (1) the four primary policies, like the two excess policies involved in the summary adjudication motion,

3

contained NVP provisions that were applicable to bar the District's claim for indemnity; (2) the third excess policy (not included in the summary adjudication motion) did not contain an NVP provision, but the District was nonetheless precluded under the policy terms from seeking indemnification because its obligations under the Consent Decree were not the result of either an adjudication or a compromise with Century's written consent; and (3) because there was no liability for breach of contract, Century was likewise not liable for breach of the covenant of good faith and fair dealing. On June 21, 2019, the trial court granted the motion for summary judgment, and judgment was entered on August 7, 2019.

The District contends that the trial court erred in finding that the NVP provisions of the insurance policies barred the District from seeking indemnification. It disagrees with the court's conclusion that the District's execution of the Consent Decree and expenditure of funds in compliance with it constituted voluntary payments. The District argues, inter alia, that (1) its entering into the Consent Decree was not voluntary, (2) because it notified Century of the NRD Claim in August 2000, it was not required to give it a second notice when it settled the claim in 2005, (3) Century is equitably estopped from asserting the NVP policy provisions, and (4) Century waived the right to enforce them.

We conclude that the trial court properly found that the NVP provisions in the two excess policies barred the District from seeking indemnification for the expenses it incurred as a result of entering into the Consent Decree. Because the District, without notifying Century or obtaining its consent, settled the NRD Claim and incurred expenses to comply with its obligations under the Consent Decree, its actions constituted a voluntary payment that precluded its right to seek indemnity under the policies. In so holding, we find that the NVP provisions apply to the District's settlement even though it was achieved through a consent decree rather than a more traditional settlement agreement. We conclude further that because the NRD Claim was disposed of by

4

settlement as embodied in the Consent Decree, there was no "adjudication" that gave rise to an "ultimate net loss" that would have given the District the right to pay the obligation and thereafter seek indemnification from Century. We also reject the District's positions that (1) its giving of notice of the NRD Claim to Century in August 2000 eliminated the need for it to notify the insurer five years later that it was settling that claim (through the Consent Decree) and of the filing of the federal action in which that decree was entered; (2) its act of entering into the Consent Decree was not voluntary and therefore did not violate the NVP provisions; (3) Century was equitably estopped from asserting the NVP provisions; and (4) Century waived the right to assert such provisions. Based upon these conclusions, we find that the trial court did not err in granting the motion for summary adjudication.

Lastly, we conclude that the trial court did not err in granting summary judgment because (1) Century's motion for summary judgment concerned the applicability of NVP provisions in the primary liability policies that were similar to the provisions in the two excess policies that the trial court properly found in the prior order granting summary adjudication barred the District's right to indemnity; (2) although the third excess policy did not contain an NVP provision, the District was not entitled to indemnity under that policy; and (3) because the breach of contract claim failed, the claim for breach of the covenant of good faith was not viable. We will therefore affirm the August 7, 2019 judgment entered on the order granting summary judgment.[2]

---

[2] After the record was prepared and the case was fully briefed, counsel advised the court by letter the day before oral argument that the parties had reached a settlement, and later the same day, the court received a request and a joint stipulation for dismissal of the appeal. This court denied the request and stipulation for dismissal. (See Cal. Rules of Court, rule 8.244(c)(2).) Because the appeal presents important legal issues of continuing interest to the public, we will exercise our discretion to proceed in deciding the appeal. (See *Berroteran v. Superior Court* (2022) 12 Cal.5th 867, 876-877.)

## II. PROCEDURAL BACKGROUND

### A. Complaint

On October 5, 2015, the District filed a complaint against Century alleging claims for breach of contract and breach of the covenant of good faith and fair dealing arising out of the insurance policies. The District alleged that Century had insured it under at least six primary and excess insurance policies. It alleged that it had incurred approximately $8.4 million for expenses in complying with the Consent Decree. The District alleged further that it had exhausted the limits under primary policies, and that it was entitled to indemnity under one or more of the excess policies issued by Century. The District alleged that "[b]y failing to unequivocally inform the District of [Century's] position, [Century] has effectively denied coverage in breach of its contractual obligations."

### B. Motion for Summary Adjudication

#### 1. Century's Motion

##### a. Century's Contentions

Pursuant to stipulation of the parties and order, Century filed a motion for summary adjudication. Century argued that the District had no right to indemnity under the two excess insurance policies for its expenditure made to comply with its obligations under the Consent Decree.[3] Century asserted that the District could not seek indemnification because it had failed to advise Century that it was settling the claim by entering into the Consent Decree. Citing *Jamestown Builders, Inc. v. General Star Indemnity Co.* (1999) 77 Cal.App.4th 341 (*Jamestown Builders*), Century contended that the NVP provisions of the excess policies barred the District's recovery under the excess policies because "insureds cannot unilaterally settle a claim before the establishment of

---

[3] Although the District brought suit on three excess insurance policies, the parties stipulated that only two excess policies, XBC 22333 and XBC 22358, were at issue in the summary adjudication motion.

the claim against them and the insurer's refusal to defend in a lawsuit to establish liability." (*Id*. at p. 346.)

### b. Evidence Presented by Century

#### (1) Policy Terms

The excess policy (XBC 22333) provided that Century would "indemnify the [District] for ultimate net loss in excess of the retained limit . . . which the [District] shall become legally obligated to pay as damages because of . . . property damage . . . to which this policy applies, caused by an occurrence." That excess policy also stated that for an occurrence "covered by this policy except for the amount of retained limit specified herein, [Century] will, in addition to the amount of the ultimate net loss payable: . . . defend any suit against the [District] seeking damages on account of . . . property damage . . . and may make such investigation and settlement of any claim or suit as it deems expedient."[4]

The excess policy provided further that it did "not apply to defense, investigation, settlement or legal expenses covered by the underlying insurance, but [Century] shall have the right and opportunity to associate with the [District] in the defense and control of any claim or proceeding reasonably likely to involve [Century] . . . . In the event that the limits of liability of the underlying Insurance . . . are exhausted by an occurrence, [Century] shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the [District] resulting from the same occurrence, but only where this policy applies and is immediately in excess of such listed underlying insurance without intervening excess insurance with another insurer."

---

[4] Excess policy XBC 22358 contained provisions similar to the two provisions in policy XBC 22333 quoted above.

7

Lastly, the excess policy (XBC 22333) contained an NVP clause providing that "[t]he [District] shall not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any expense. . . ."[5]

### (2) Claim and Communications History

On August 10, 2000, the District's counsel sent a letter to Century (the Claim Letter) in which it gave "notice of claims asserted against it by the United States of America and the State of California regarding alleged natural resource damages concerning mercury impacts in the Guadalupe River Watershed." The Claim Letter enclosed two letters from the United States Department of the Interior. One of the letters indicated that the United States had drafted a tolling agreement for execution that "would permit the various parties to put their energies into determining the nature and extent of any such [natural resource] injuries rather than into litigation." Neither the Claim Letter nor its enclosures indicated the existence of a lawsuit, and it was undisputed that there was no lawsuit until years later.

On August 31, 2000, Century acknowledged in writing its receipt of the Claim Letter. In that letter, Century advised the District that there were specific coverage issues that might exist and that might "warrant further investigation." It requested in the letter that the District assist it with that investigation by providing additional information about the claim, including the "[s]tatus on [the District's negotiations with the claimants" and "on the investigation and remediation of the site." Thereafter, on several occasions between September 2000 and May 2002, Century made similar written requests that the District provide information to assist Century with its investigation.

On May 31, 2001, Century advised the District in writing that Century had no duty to defend the District under the primary insurance policies because "no lawsuit ha[d] been filed . . . If you should have documentation that would suggest otherwise, please

---

[5] Excess policy XBC 22358 contained an NVP provision substantially the same as the NVP provision in policy XBC 22333 quoted above.

8

forward that documentation for review." Century further reserved its rights under the excess policies (including XBC 22333 and XBC 22358), and it stated "[a]ccordingly, subject to the other terms, conditions, exclusions and endorsements of the policies, we do not have any obligation to indemnify unless and until the underlying limits have been exhausted. If and when you should receive documentation that would show that the underlying limits have been or will potentially be exhausted . . . please forward that documentation for review so that we may determine if and when our layers of coverage may be involved. We reserve the right to disclaim coverage for this matter under [the excess] policies . . . based on any policy terms, conditions, exclusions and endorsements . . . . Furthermore, . . . as there is no suit, there will be an issue whether any costs potentially incurred by the District are damages in accordance with the policies."

On May 30, 2002, Century again advised the District in writing that Century was reserving its rights "under the terms, conditions, and provisions of the policies."

On June 4, 2002, the District wrote to Century concerning the claim in which it advised Century that it had retained coverage counsel. The letter did not provide Century with any information about the status of the claim, such as the substance of any negotiations with the claimants or the status of any remediation of the site. There was no communication from the District to Century between June 4, 2002, and April 22, 2008.

A proposed Consent Decree was signed by the District on May 11, 2005. On July 28, 2005, the United States, at the request of Fish and Wildlife, filed a lawsuit under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9601 et seq.; CERCLA) in the United States District Court, Northern District of California (i.e., the federal action) against the District and other entities. On the same day, the fully executed Consent Decree was filed in the federal action. In it, the District, among other defendants, agreed to fund, commence and complete certain work specified in the Consent Decree. The District did not advise Century of the filing of the

9

action or the execution and filing of the Consent Decree in or about July 2005; it did not so advise Century until 33 months later, on April 22, 2008.

On April 22, 2008, the District's counsel requested in writing that Century provide indemnity under primary and excess policies (including excess policies XBC 22333 and XBC 22358) in connection with the federal action. The District advised in the letter that it "was ultimately able to negotiate a settlement with the Trustees whereby the District agreed to perform certain projects in lieu of paying money to the government. In order to effect the settlement, the Trustees filed [the federal action]." The District's counsel stated further that "[t]hose projects [under the Consent Decree] which represent the District's settlement payment, initially estimated to cost $6.5 million, have now been 40% completed. The actual cost of the work to date is approximately $4 million." A copy of the Consent Decree and the complaint filed in the federal action were transmitted to Century with the letter.

On July 3, 2008, Century responded to the District's counsel, advising that Century continued to reserve its rights under the policies. Included in the letter was a statement—alluding to the NVP provisions in the policies—that "[t]he policies may not provide coverage to the extent that the policyholder voluntarily made or makes any payment, assumed or assumes any obligation, or incurred or incurs any expense without our prior consent, as may be required by the policies." In addition, Century requested that the District provide backup documents concerning the work the District had performed under the settlement of the NRD Claim.

From April 22, 2008 to April 9, 2014, Century received no further correspondence from the District about the NRD Claim.

### 2. *The District's Opposition*

#### a. The District's Contentions

The District opposed the summary adjudication motion, arguing that it had given Century timely notice of the NRD Claim in 2000. The District asserted that Century had

10

denied any coverage obligation with respect to the two excess insurance policies at issue. The District went forward, along with another insurer (Twin City Fire Insurance Company), to contest the NRD Claim and expended approximately $1.3 million in doing so. The District ultimately resolved the claim in 2005 through execution of the Consent Decree and the filing of the federal action. The District complied with its obligations under the Consent Decree, and after a significant amount of work was completed, it notified Century to give it information as to the likely total cost of complying with the Consent Decree. In its opposition, the District contended that Century could not invoke the NVP provisions of the excess policies because the District was not required under the policies to "provide a second notice of the NRD Claim once that claim ripened into a suit."

The District argued that the NVP clauses of the two excess policies did not bar the District's claim for indemnification. The District argued that the policies contained language that "permitted the District to expend monies to satisfy the judgment," and thus Century was required to honor its indemnity obligations.

**b.** **Evidence Submitted by The District**

In April 2000, the District received the NRD Claim from the United States Department of the Interior. In a meeting held on April 11, 2000, the claimants, the Trustees, advised that they considered the District a potentially responsible party (PRP) for damages in connection with the NRD Claim. In meetings after the April 11, 2000 meeting, the Trustees reiterated that the District was a PRP, and they advised the District that it would file a lawsuit against it and others seeking approximately $40 million if the District refused to sign a tolling agreement and work toward an informal resolution of the NRD Claim. The damage claims asserted by the Trustees were consistent with the contents of a Preassessment Screen Determination (PSD Report) prepared by the Natural Resource Damage Assessment Branch, Environmental Contaminants Division, of the Sacramento Fish and Wildlife Office. It was indicated in the PSD Report that the

11

Trustees had a reasonable probability of success in asserting the NRD Claim, and that the potential damage claim might be of the magnitude of tens of millions of dollars.

After the Claim Notice was sent on August 10, 2000, and in response to Century's request for additional information, the District sent Century on November 22, 2000, a copy of the PSD Report.

The District entered into a tolling agreement with the Trustees to avoid the filing of a lawsuit. Over several years, the Trustees continued to assert that the District faced considerable exposure for the PRD Claim. The District vigorously contested the claim, but also sought a solution to limit its potential exposure to liability.

The complaint in the federal action and the Consent Decree were filed on July 28, 2005. The judgment was entered in the federal action on November 16, 2005. At the time the federal action was filed, the underlying insurance had not been exhausted, so indemnity under the subject excess policies had not yet been triggered.

After it had incurred substantial expenses to perform a portion of the work required in the Consent Decree, on April 22, 2008, the District gave written notice to Century of the prior filing of the federal action and the Consent Decree, and the District requested indemnification from Century. As of April 22, 2008, the District had had received no communication from Century concerning the NRD Claim since 2002.

The District had effectively completed the work required under the Consent Decree by 2014, and on April 9, 2014, it wrote to Century to detail the work performed and the associated costs, including three binders of backup documentation. Thereafter, the District attempted unsuccessfully to meet with Century. On January 14, 2015, Century's coverage attorney advised the District in writing of the existence of a number of potential coverage issues, including the invocation of NVP provisions as a possible bar to coverage.

### 3. The Court's Order

On March 2, 2018, the trial court granted Century's motion for summary adjudication. In so ruling, the court found that Century had met its burden as the moving party of showing, based upon application of the NVP provisions of the two excess policies, that it had no obligation to indemnify the District. The court rejected the District's position that the NVP provisions did not apply under language that permitted reimbursement where "the amount of ultimate net loss becomes certain through trial court judgment or agreement among the Insured, the claimant and [the Insurer]." It reasoned that, because under the policies, " 'ultimate net loss' is defined . . . as 'the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the Insured is liable either by adjudication or compromise with the written consent of [the Insurer],' " and there was no settlement approved by Century and no adjudication, "there was no 'ultimate net loss' for which [Century] is obligated to pay."

The court also concluded that the District was required to give notice to Century of the Consent Decree before entering into it voluntarily, thereby incurring an obligation for which indemnity was sought. And the trial court rejected the District's contentions that its agreement to enter into the Consent Decree was involuntary, and that Century was barred by waiver and estoppel from asserting the NVP provisions as a bar to coverage.

### C. First Amended Complaint

Pursuant to stipulation and order, the District filed a first amended complaint in February 2019. The District alleged that it was the insured under four primary insurance policies issued by Century. It alleged further that it was the insured under three excess liability policies issued by Century, namely, the two excess policies at issue in the prior summary adjudication motion (XBC 22333 and XBC 22358), and a third policy, XBC 22050.

The District alleged as a claim for breach of contract that Century "was obligated, pursuant to the [Century] policies, to indemnify the District for the costs associated with

13

[its] obligations under the Consent Decree and Judgment." It alleged further that Century had "delayed, failed, and refused to provide coverage," and that the District had suffered resulting damage. The District alleged a second cause of action for breach of the covenant of good faith and fair dealing (breach of good faith covenant).

### D. Motion for Summary Judgment

Century filed a motion for summary judgment, which was opposed by the District. The motion was based upon Century's prior motion for summary adjudication and the trial court's ruling on that motion. Century's motion for summary judgment as to the first cause of action breach of contract was founded on the arguments that (1) the NVP provisions of the excess policies (XBC 22333, and XBC 22358) barred coverage for the costs that the District voluntarily incurred, as the court had previously found in the order granting motion for summary adjudication; (2) the NVP provisions of the four primary insurance policies barred coverage for costs sought by the District because they were voluntarily incurred; and (3) the excess policy XBC 22050 provided for indemnification "for 'ultimate net loss in excess of the retained limit,' . . . 'ultimate net loss' is defined as 'the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of [Century],' " and the expenses incurred by the District were not the result of an adjudication or a compromise with Century's consent. The motion as to the second cause of action was based upon the position that since there was no coverage under any of the subject policies, Century was not liable for breach of good faith covenant.

On June 21, 2019, the trial court granted the motion for summary judgment on the same grounds as those it had relied upon in granting the prior summary adjudication motion. The court in its order noted that it was the District's position that summary judgment should be denied because the NVP provisions in the policies did not apply, the District's agreement in the Consent Decree was not voluntary, and that the court should change its prior ruling on the motion for summary adjudication. As to the latter

14

argument, the trial court found that it was an improper motion for reconsideration under section 1008.

The trial court rejected the District's contentions. It reasoned, in part: "[The District] does not dispute any of the facts set forth in [Century's] separate statement of material facts . . . . [The District] does not contend there is any material difference between the policies that were the subject of the prior motion for summary adjudication and the policies at issue in the motion for summary judgment now before the Court. [The District] relies on essentially the same material evidence and arguments that were before the Court on the prior motion. [¶] The material evidence, facts, and issues before the Court on this motion were already considered and ruled on in the summary adjudication order. [The District] provides no basis for the Court to reach a different conclusion now."

The court entered judgment on the summary judgment order on August 7, 2019.[6] The District filed a timely notice of appeal from the judgment.

### III.    DISCUSSION

#### A.    Applicable Law

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) As such, the summary judgment statute, Code of Civil Procedure section 437c,[7] "provides a particularly suitable means to test the sufficiency of the plaintiff's prima facie case and/or of the defendant's [defense]." (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 203.)

---

[6] The judgment was amended on October 7, 2019, to include an award of costs in favor of Century.

[7] All unspecified statutory references are to the Code of Civil Procedure.

Summary judgment is appropriate where the "action has no merit or . . . there is no defense to the action or proceeding." (§ 437c, subd. (a).) Even where there may be triable issues in the case, a party may move for summary adjudication on the grounds that there is no merit to one or more causes of action, one or more claims for damages has no merit, the claim for punitive damages is without merit, there is no affirmative defense to one or more claims, there is no merit to one or more affirmative defenses, or that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. (§ 437c, subd. (f)(1).) Also, where the parties stipulate that the motion will further the interests of judicial economy or promote settlement, "a party may move for summary adjudication of a legal issue or a claim for damages other than punitive damages that does not completely dispose of a cause of action, affirmative defense, or issue of duty." (§ 437c, subd. (t).)

It is the moving party's burden of persuasion to show "that there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law." (*Aguilar*, *supra*, 25 Cal.4th at p. 850, fn. omitted.) Where the defendant moves for summary judgment, it must " 'show[ ] that one or more elements of the cause of action . . . cannot be established' by the plaintiff." (*Id.* at p. 853, quoting § 437c, subd. (*o*)(2).) That burden is met when a defendant presents affirmative evidence that negates an essential element of the plaintiff's claim. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) A defendant may alternatively meet its burden by submitting evidence "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence" supporting an essential element of its claim. (*Aguilar*, *supra*, at p. 855.) "Once the defendant meets the foregoing burden, 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action . . . [and] set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' [Citation.]" (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 780 (*Saelzler*), quoting § 437c, subd. (*o*)(2).)

16

The court, in ruling on a summary judgment motion, is required to " 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation]." (*Aguilar*, supra, 25 Cal.4th at p. 843.) In considering the evidence presented by the parties in the summary judgment motion, the court "strictly scrutinize[es]" the declarations submitted by the moving party and "liberally constru[es]" those offered by the opposing party, and it "resolv[es] any evidentiary doubts or ambiguities in [the opposing party's] favor." (*Saelzler*, supra, 25 Cal.4th at p. 768.) The opposing party may rely upon inferences, but "those inferences must be reasonably deducible from the evidence, and not such as are derived from speculation, conjecture, imagination, or guesswork. [Citation.]" (*Joseph E. Di Loreto, Inc. v. O'Neill* (1991) 1 Cal.App.4th 149, 161.) And inferences properly derived from the parties' evidence are viewed "in the light most favorable to the opposing party." (*Aguilar*, supra, at p. 843.)

Summary judgment motions involve pure questions of law. Accordingly, we review independently the granting of summary judgment to ascertain whether there is a triable issue of material fact justifying the reinstatement of the action. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) In our review, we "consider[] all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

## B.    Order Granting Summary Adjudication

The summary adjudication motion was based upon Century's contention that the District's action of voluntarily entering into the 2005 Consent Decree without Century's knowledge or approval constituted a voluntary payment that barred the District's recovery under the two excess policies. We examine below the law concerning NVP

17

provisions contained in insurance policies, the content and potential application of the specific NVP provisions here, and the District's arguments that its right to indemnification was not barred by those provisions.

### 1.    Law Concerning NVP Provisions

The California Supreme Court, in *Pitzer College v. Indian Harbor Ins. Co.* (2019) 8 Cal.5th 93 (*Pitzer College*)—a decision filed approximately one and one-half years after the summary adjudication order here—explained the nature and purpose of no voluntary payment provisions contained in third-party insurance contracts (such as the ones at issue here).  The high court stated that "third party coverage obligates the insurer to defend, settle, and pay damages claimed by a third party against the insured. . . .  'A third-party liability policy . . . provides coverage for liability of the insured to a "third party" who has been injured because of the insured's negligence.  [Citation.]' " (*Id.* at p. 107.)  The Supreme Court, quoting and relying on *Jamestown Builders, supra*, 77 Cal.App.4th 341—which was relied on by the trial court here—explained:  "In third party cases, 'the decision to pay any remediation costs outside the civil action context raises a judgment call left solely to the insurer.'  [Citation.]  [¶] In third-party insurance policies, then, consent provisions, sometimes called 'no voluntary payment' provisions, 'are designed to ensure that responsible insurers that promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim.'  [Citation.]  *Jamestown Builders* explained that these consent clauses mean that 'insureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability. . . .  In short, the provision protects against coverage by fait accompli.'  [Citation.]  The insurer's duties to defend and settle a lawsuit are crucial to its coverage obligations.  [Citations.]  Because the insurer's right to control the defense and settlement of claims is paramount in the third-party context, California appellate courts have generally refused to find the notice-prejudice rule applicable to consent provisions in third-party policies.  [Citations.]"

18

(*Pitzer College*, *supra*, at p. 108; see also *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.* (1970) 3 Cal.3d 434, 449 [purpose of insurance provisions that required insured to obtain insurer's consent and requesting insurer to furnish a defense before voluntarily incurring defense costs " 'is to prevent collusion as well as to invest the insurer with the complete control and direction of the defense or compromise of suits or claims' "].)[8]

In asserting a breach by the insured of an NVP provision, the insurer need not show prejudice. (*Belz v. Clarendon America Ins. Co.* (2007) 158 Cal.App.4th 615, 625-626.) Further, while it is more common for a voluntary payment by an insured in violation of an NVP provision to occur before tender of the claim, it may also occur (and the violation of that provision may be so asserted by the insurer) after tender of the claim. (See *Low v. Golden Eagle Ins. Co.* (2003) 110 Cal.App.4th 1532, 1546 (*Low*) [enforcing NVP provision in "the rare case where the insured tenders the defense and then negotiates a settlement on its own, leaving the insurer in the dark"].)

In *Jamestown Builders, supra*, 77 Cal.App.4th 341, the court applied an NVP provision in a third-party comprehensive general liability (CGL) insurance contract to bar an indemnity claim. (*Id.* at pp. 343-344.) The insured, a developer, expended $1.24 million to remedy water intrusion problems in a development prior to informing the insurer of the homeowners' claims or of the remedial work performed by the insured. After the developer tendered the claims, it expended an additional $222,000 to effect further repairs without first obtaining the insurer's consent. (*Id.* at p. 345.) The trial court held that the action for breach of the insurer's obligation to indemnify the insured

---

[8] The high court described the "California's notice-prejudice rule" as one which "generally allows insureds to proceed with their insurance policy claims even if they give their insurer late notice of a claim, provided that the late notice does not substantially prejudice the insurer. [Citation.]" (*Pitzer College*, *supra*, 8 Cal.5th at p. 97.)

19

for the repair expenses it incurred was barred by the NVP provision of the insurance contract. (*Id.* at pp. 345.)

In upholding the enforcement of NVP provision, the appellate court concluded that none of the exceptions to application of the provision, namely, "insurer breach, or other extraordinary circumstances," applied. (*Jamestown Builders*, *supra*, 77 Cal.App.4th at p. 346.) The insurer had not "decline[d] a tendered defense[, thereby rendering the insurer] . . . out of luck. An insured that has been abandoned by its carrier and left exposed to the possibility of a default judgment may protect its own interests by entering into a reasonable settlement without losing its right to recover on the policy." (*Id.* at pp. 347-348.) The *Jamestown Builders* court held further that this was not an instance in which the insured's "previous payments were made involuntarily because of circumstances beyond its control . . . , [such as] where the insured is unaware of the identity of the insurer or the contents of the policy. [Citation.]" (*Id.* at p. 348.) The court also found that the developer had not made the payments because it was "faced with a situation requiring immediate response to protect its legal interests. [Citation.]" (*Ibid.*) And the appellate court rejected the developer's argument that the insurer was required to show prejudice. (*Id.* at pp. 349-350.)[9]

---

[9] The District argues that the court in *Jamestown Builders, supra*, 77 Cal.App.4th 341 "expressly rejected the argument that expenses incurred *after* the insured puts the carrier on notice of a claim to the insurer are barred by the NVP clause." (Original italics.) However, the court there did not hold categorically that only pre-tender voluntary payments are barred by an NVP provision, while post-tender voluntary payments are not. In fact, the *Jamestown Builders* court held that, because the insured, *after* tendering the claim to the insurer, settled with claimants without the insurer's consent, the NVP provision barred the insured from seeking indemnification for those post-tender $222,000 in repair costs and damages paid to homeowners. (*Id.* at p. 351; see also *Low*, *supra*, 110 Cal.App.4th at pp. 1546-1547 [holding that, where insured settled claim post-tender without insurer's consent, NVP provision could be asserted to bar indemnification].)

### 2.    *Application of NVP Provisions in Century's Excess Policies*

The two excess policies at issue in the summary adjudication motion (XBC 22333 and XBC 22358) contained nearly identical NVP provisions, the key language reading: "The [District] shall not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any expense . . . ."  The evidence was undisputed that the District, in fact, voluntarily assumed obligations as provided in the Consent Decree and made payments and incurred expenses pursuant to that agreement without the knowledge, involvement, or approval of Century.

The District notified Century in August 2000 of the potential NRD Claim, and its last communication with the insurer before settling that claim was in June 2002 (when it merely advised Century that it had retained coverage counsel).  The District did not contact Century about the NRD Claim for almost six years (until April 2008).  Between June 2002 and May 2005, however, the District held extended discussions with the Trustees concerning the NRD Claim.  According to the declaration of the District's counsel filed in opposition to the motion, (1) "the Trustees continued to pursue the NRD Claim, asserting the District faced substantial liability exposure"; (2) "the District entered into a tolling agreement with the Trustees due to concerns regarding the District's potential liability in the event a lawsuit was filed"; (3) "[t]he District vigorously contested the NRD Claim while simultaneously seeking a solution that would limit its potential exposure"; and (4) "[t]he District incurred just under $1.3 million in defending against the NRD Claim up until the Consent Decree was finalized."

The discussions between the Trustees and the District culminated in the execution of the Consent Decree.  The attorney for the District declared that "[t]he terms of the Consent Decree, along with the obligations imposed on the District under it, were heavily negotiated by the District's counsel."  The District signed the decree on May 11, 2005.  The Consent Decree included recitals that it was "made in good faith after arm's-length negotiations"; "settlement of this matter and entry of this Decree [would] avoid

21

complicated and potentially costly litigation between the Parties"; and "[the Consent Decree was] the most appropriate means to resolve the matters covered [t]herein, and [was] fair, reasonable, consistent with the purposes of CERCLA, and in the public interest."[10]  Indeed, when it notified Century almost three years later of the execution of the Consent Decree and the filing of the federal action, the District itself referred to the Consent Decree as "a settlement" that it had "ultimately [been] able to negotiate with the Trustees whereby the District agreed to perform certain projects in lieu of paying money to the government."

The District did not notify Century at the time the federal action and Consent Decree were filed on July 25, 2005.  It did not do so until April 22, 2008.  By that time, the District had expended approximately $4 million to perform work under the Consent Decree, which it estimated as constituting approximately 40 percent of the work.

Based upon the undisputed facts presented below, Century established that the District's request for indemnity was barred under the NVP provisions in the excess policies.  Applying the principles enunciated in *Pitzer College*, the District's conduct of negotiating and executing a settlement agreement (the Consent Decree) obligating it to incur substantial funds to settle the NRD Claim usurped the exclusive contractual role of the third-party liability insurer, Century, of making the " 'judgment call' " concerning the " 'decision to pay any remediation costs outside the civil action context.' " (*Pitzer College*, *supra*, 8 Cal.5th at p. 108; see also *ibid.* ["the insurer's right to control the defense and settlement of claims is paramount in the third-party context"].)  As was the case with the insured in *Jamestown Builders,* the District agreed voluntarily to obligate itself to resolve a claim and went forward with making substantial expenditures to resolve a claim prior to notifying the insurer that it was making such an agreement or expending

_____

[10] There were numerous references in the Consent Decree (collectively, approximately 100) to the effect that it was a settlement or that the defendant signatories, including the District, were "Settling Defendants."

22

funds to comply with it. (See *Jamestown Builders, supra*, 77 Cal.App.4th at p. 346 [the import of an NVP provision is that "insureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability"].) The Consent Decree to which the District agreed, without Century's consent, was therefore "coverage by fait accompli" (*ibid.*), precluded by the NVP provisions here.

The fact that the insured's settlement made without the participation or approval of the insurer was in the form of a consent decree does not alter our conclusion that the NVP provisions of the excess policies applied in this case. As the California Supreme Court has explained, " '[B]ecause their terms are arrived at through mutual agreement of the parties, consent decrees . . . closely resemble contracts.' [Citation.] . . . 'Indeed, it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all.' [Citation.] 'More importantly, it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree.' [Citation.]" (*Aerojet-General Corp. v. Transport Indem. Co.* (1997) 17 Cal.4th 38, 66-67, fn. omitted (*Aerojet-General*).) The Consent Decree here was, as described in the document, a "settlement." It was, by the District's admission, "heavily negotiated by the District's counsel." Although the settlement by the Trustees and the District took the form of a consent decree, this did not alter the fact that it was an agreement to settle a third-party claim without the consent of the insurer. Concluding that this agreement, because it took the form of a consent decree, was not subject to the NVP provisions of the excess policies "would be a triumph of form over substance." (*Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 921; cf. *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 840 [rejecting interpretation of CGL insurance policy that would "exalt form over substance"].)

Our conclusion that the NVP provisions apply here where the settlement was achieved through a consent decree is supported further by case law concerning the binding effect upon insurers of stipulated judgments, procedural vehicles bearing similarities to consent decrees. (See *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 658, 664 ["[i]n a stipulated judgment, or consent decree, litigants voluntarily terminate a lawsuit by assenting to specified terms, which the court agrees to enforce as a judgment"]; see also *DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 725 ["consent decrees and stipulated judgments are privately negotiated remedies"].) In *Hamilton v. Maryland Cas. Co.* (2002) 27 Cal.4th 718, 721-722 (*Hamilton*), the California Supreme Court addressed a settlement in excess of policy limits between the insured and the claimant to which the insurer, who had agreed to defend the insured, had not consented. The settlement took the form of a stipulated judgment approved by the court as a good-faith settlement under section 877.6. (*Hamilton*, *supra*, at p. 722.) Specifically, the Court considered whether a stipulated judgment could be treated as a presumptive measure of the damages the policyholder suffered as a result of the insurer's failure to enter into a reasonable settlement. (*Id.* at p. 725.) The Supreme Court concluded that the stipulated judgment was entitled to no weight in a later proceeding against the insurer because it was reached without the insurer's consent: "A defending insurer cannot be bound by a settlement made without its participation and without any actual commitment on its insured's part to pay the judgment, even where the settlement has been found to be in good faith for purposes of section 877.6." (*Id.* at p. 730.)

Similarly, in *Safeco Ins. Co. v. Superior Court* (1999) 71 Cal.App.4th 782, 785-786 (*Safeco*), the court addressed whether an insurer (Safeco) was bound by a stipulated judgment in the amount of $645,000 executed (without Safeco's consent) by the insured (the Reads) and the plaintiffs (the family of the man killed in the incident). The

24

stipulation provided that the Reads admitted liability, the plaintiffs would accept $145,000 from another insurer providing coverage to the Reads, the plaintiffs would not execute against the Reads as to the balance of the judgment, and the Reads would assign their rights under the Safeco policy to the plaintiffs. (*Id.* at p. 786.) The policy issued by Safeco contained a " 'no action' " provision stating that " '[n]o action . . . shall be brought against [the insurer] until the obligation of the insured has been determined by final judgment or agreement signed by [the insurer].' " (*Ibid.*) The court concluded that Safeco was not bound by the stipulated judgment, holding: "The 'no action' clause gives the insurer the right to control the defense of the claim—to decide whether to settle or to adjudicate the claim on its merits. [Citation.] When the insurer provides a defense to its insured, the insured has no right to interfere with the insurer's control of the defense, and a stipulated judgment between the insured and the injured claimant, without the consent of the insurer, is ineffective to impose liability upon the insurer. [Citations.]" (*Id.* at p. 787.)

We conclude that Century established that the District's right to indemnity was barred under the NVP provisions in the excess policies. We will address below the several arguments made by the District challenging the trial court's enforcement of the NVP provisions here.

### 3.      *Language of Limitation in NVP Clauses*

The District argues (as it did below) that the NVP provisions in the two excess policies contained language of limitation which rendered the NVP provisions inapplicable in this instance. It asserts that under the limiting language, because the amount that was subject to a right to indemnity (the "ultimate net loss") was determined

by a "trial court judgment," the District was permitted to expend sums to satisfy the judgment and seek indemnification later.[11]

The entire paragraph in each excess policy containing the NVP provision (with italicization of the language upon which the District relies) reads: "The Insured shall cooperate with [Century] and upon [its] request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of personal injury or property damage or advertising injury with respect to which insurance is afforded under this policy; and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense; *however, in the event that the amount of ultimate net loss becomes certain either through trial court judgment or agreement among the Insured, the claimant and [Century], then, the Insured may pay the amount of ultimate net loss to the claimant to effect settlement and, upon submission of due proof thereof, [Century] shall indemnify the Insured for that part of such payment which is in excess of the retained limit, or, [Century] will, upon request of the Insured, make such payment to the claimant on behalf of the Insured*." (Italics added.) The District contends that because there was a "trial court judgment" under which it became obligated to perform the remedial work for which it seeks indemnification, the NVP provision did not preclude it from expending funds to comply with the judgment. To the contrary (the District argues), the limiting language "expressly permitted the District to expend monies to satisfy the judgment and Century was obligated to indemnify the District for those sums."

---

[11] The District terms the language upon which it relies as an "exception" to an exclusionary clause in the policies. For the reasons we discuss here, the NVP clauses were not exclusionary provisions, and, hence, language explaining or limiting the NVP clause was not an exception to an exclusionary clause.

26

We disagree.  In interpreting the meaning of the language of limitation in the NVP provision, we must construe the language of the excess policies as a whole.  '' '[A]n insurance contract is to be construed in a manner which gives meaning to all its provisions in a natural, reasonable, and practical manner, having reference to the risk and subject matter and to the purposes of the entire contract.  [Citation.]'  [Citation.]" (*Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1169; see also Civ. Code, § 1641 ["[t]he whole of a contract is to be taken together, so as to give effect to every part . . . each clause helping to interpret the other"].)  The limiting language upon which the District relies references an "event" in which "the amount of *ultimate net loss* becomes certain."  (Italics added.)  (See *Columbia Casualty Co. v. Northwestern Nat. Ins. Co.* (1991) 231 Cal.App.3d 457, 471 [" 'ultimate net loss' as used in the endorsements which provide for coverage is a term of art, a phrase defined by the policy"].)  The italicized term is defined elsewhere in the excess policies:  " '[U]ltimate net loss' means the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the Insured is liable *either by adjudication or compromise with the written consent of* [*Century*] . . . ."  (Italics added.)  Plainly, there was no compromise with Century's written consent.  The question is whether there was a liability resulting from an "adjudication" to meet the definition of an "ultimate net loss."  The trial court concluded, correctly, that "there was no adjudication."

An adjudication suggests a matter submitted by the parties that is decided by the court.  It is "[t]he legal process of resolving a dispute; the process of judicially deciding a case."  (Black's Law Dict. (11th ed. 2019), p.  52, col. 1 (Black's Law); see also *ibid*. ["adjudicate:  [t]o rule on judicially"]; The American Heritage Dictionary of the English Language (5th ed. 2011), p. 21, col. 2 ["adjudicate . . .-cated, . . .-cating, . . .-cates:  [t]o

27

make a decision (in a legal case or proceeding), as where a judge or arbitrator rules on some disputed issue or claim between the parties"].)[12]

It cannot be reasonably concluded that the procedure employed here by the Trustees and the District (i.e., the presuit execution and later filing of the Consent Decree), involved "[t]he process of judicially deciding a case." (Black's Law, *supra*, at p. 52, col. 1.) Nor was the Consent Decree an "adjudication" in the sense that it was "submitted to the trial court for its consideration in deciding a substantive matter in that action. [Citations.]" (*Mercury Interactive*, *supra*, 158 Cal.App.4th at p. 91.) Rather, it was a "case" in which the outcome was determined consensually by the parties before it was even filed with the court. After "[t]he District vigorously contested the NRD Claim" and expended nearly $1.3 million doing so—as stated by the attorney for the District in opposing the motion—it, along with the other settling defendants and the Trustees, entered into a settlement memorialized in the Consent Decree that, as recited in that decree, was "made in good faith after arm's-length negotiations." The filing of the complaint and the Consent Decree in the federal action, upon which judgment was

---

[12] In a dispute concerning public access to court records under the sealed records rules (Cal. Rules of Court, rules 2.550, 2.551), a panel of this court reached a similar conclusion in interpreting language in a California Supreme Court case that focused on the word "adjudication." (See *Mercury Interactive Corp. v. Klein* (2007) 158 Cal.App.4th 60 (*Mercury Interactive*).) The Supreme Court, in a case that preceded, and was the basis for, the Judicial Council's adoption of the sealed records rules, had stated in a footnote that "[n]umerous reviewing courts . . . have found a First Amendment right of access to civil litigation documents filed in court *as a basis for adjudication*." (*NBC Subsidiary (KNBC–TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1208, fn. 25, italics added (*NBC Subsidiary*).) In *Mercury Interactive*, this court concluded that the Supreme Court's language could not "reasonably be read as saying that there have been numerous appellate decisions finding the existence of a constitutional right of access to *any* documents filed in a civil case. [Citation.] . . . [¶] . . . We conclude that . . . [based upon the qualifying phrase, 'as a basis for adjudication,' the quoted language from *NBC Subsidiary*] meant that a number of appellate courts had found a First Amendment right of access to documents filed in a civil case where they were submitted to the trial court for its consideration *in deciding a substantive matter in that action*. [Citations.]" (*Mercury Interactive*, *supra*, at pp. 90-91, second italics added.)

28

entered by the court shortly thereafter, was not an "adjudication," i.e., a judicial decision of a controversy, that resulted in an "ultimate net loss" under the excess policies.

This conclusion is informed by the nature of the Consent Decree here, and by the nature of consent decrees generally. As the California Supreme Court has explained, quoting the United States Supreme Court in *Firefighters v. Cleveland* (1986) 478 U.S. 501: " 'To be sure, consent decrees bear some of the earmarks of judgments entered after litigation. At the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts.' [Citation.] Their 'most fundamental characteristic,' however, is their 'voluntary nature.' [Citation.] 'Indeed, it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all." [Citation.] 'More importantly, it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree.' [Citation.]" (*Aerojet-General*, *supra*, 17 Cal.4th at pp. 66–67, fn. omitted.)

The judgment entered here on the Consent Decree was founded upon the parties' agreement—an agreement that the District executed *more than two months before the Consent Decree was filed in the federal action*.[13] The Consent Decree itself recited that it was a "settlement" that had been "made in good faith after arm's-length negotiations" to "avoid complicated and potentially costly litigation." The judgment was not an "adjudication" by the court that gave rise to an "ultimate net loss" under the excess policies that could be paid by the District "to the claimant to effect settlement" with the District thereafter being permitted to require indemnification from Century as to any amount "in excess of the retained limit."

_____

[13] As one of the "Settling Defendants," the District consented to entry of the Consent Decree "without further notice . . . [and] further agree[d] not to oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless either the United States or CDFG has notified Settling Defendants in writing that it no longer supports entry of the Decree."

The District also argues, citing *Miller v. Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 751, that the NVP provisions here are exclusionary clauses, and as such, must be strictly construed against the insurer. While we agree with this general proposition concerning the interpretation of exclusionary clauses (see *Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 322), the District provides no authority that an NVP provision in an insurance policy is, in fact, an exclusionary clause. (See *People ex rel. 20th Century Ins. Co. v. Building Permit Consultants, Inc.* (2000) 86 Cal.App.4th 280, 284 [failure to cite legal authority for position in appellate brief "amounts to an abandonment of the issue"].)

"Insurance policies have two parts: (1) the insuring agreement which defines the type of risks covered under the policy; and (2) the exclusions, which remove coverage for certain risks which initially fall within the insuring clause. [Citation.] Exclusions serve two purposes: They avoid coverage for risks the insurer elects not to insure and limit coverage for risks normally covered by other insurance." (*Van Ness v. Blue Cross of California* (2001) 87 Cal.App.4th 364, 373-374.)

An NVP provision, both generally and in this instance, is a term and condition prohibiting the insured from making a voluntary payment or a voluntary undertaking of liability, rather than an exclusion that removes from coverage certain risks under the policy. (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2022) ¶ 3.170.5, p. 3-54 [describing policy provision that prohibits "insured from making any payment or incurring any expense without the insurer's consent" as "a condition"].) Furthermore, in this instance, the NVP provision appears under the section of the respective excess policies entitled "**CONDITIONS**"; the language does not appear under the section of the respective policies entitled "**EXCLUSIONS**." Accordingly, we reject the District's unsupported argument that the NVP provisions are exclusionary clauses that must be strictly construed against the insurer.

30

The District characterizes the language of limitation discussed here—which it contends permitted it to pay voluntarily the "ultimate net loss" determined "through trial court judgment" and later seek indemnification—as an exception to "the NVP exclusion." It asserts that, therefore, the exception must be construed broadly in favor of the insured. (See *E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470) We have concluded, however, that the NVP provisions in the excess policies were not exclusionary clauses. It necessarily follows that the language of limitation in the NVP provisions is not governed by the rules of interpretation for exceptions to exclusionary clauses.

### 4.    *Effect of August 2000 Notice of Claim*

The District argues on several occasions in its briefs that, because it notified Century in August 2000 of the NRD Claim, "the trial court erred in concluding the District was required to provide a second notice to avoid forfeiture under the NVP [provisions]." The District contends that there is no provision in the excess policies that required it to give a second notice of the NRD Claim, and that it fulfilled its contractual obligations through the August 2000 Claim Notice. The District's argument is unavailing.

The District notified Century on August 10, 2000—over five years before any suit was filed—that the Trustees had asserted the NRD Claim against it. The letter from the District's counsel enclosed a copy of a letter dated April 21, 2000, from the United States Department of the Interior stating in part that a tolling agreement had been prepared so that the involved parties could "put their energies into determining the nature and extent of any such injuries [resulting from mercury contamination to the Guadalupe River watershed] rather than into litigation."

Century notified the District on May 31, 2001, that, as to the primary policies, the insurer had no duty to defend with respect to the NRD Claim "since no lawsuit ha[d] been filed." Century advised the District that it should provide the insurer if it had "documentation that would suggest otherwise." In the same letter, Century advised the

District that, with respect to the excess policies, it had no indemnity obligation "unless and until the underlying limits have been exhausted. If and when you should receive documentation that would show that the underlying limits have been or will potentially be exhausted as a result of the above captioned matter, please forward that documentation for review so that we may determine if and when our layers of coverage may be involved." Century's excess policy (XBC 22333) provided that in the event the limits of liability were exhausted by an occurrence, Century would become obligated "to assume charge of settlement or defense of a claim or proceeding against the Insured . . . where the policy applie[d]."[14] Both excess policies further required the insured to "immediately forward to [Century] every demand, notice, summons or other process" in the event a "claim is made or suit is brought against the Insured."[15]

The District's August 2000 notice to Century of a potential claim by the Trustees against it did not relieve it of the obligation to notify Century in the event the potential claim ripened into a lawsuit or if circumstances known to the insured indicated a likelihood that the underlying liability would be exhausted and that Century's indemnification obligations under the excess policies would be implicated. Under the District's "no second notice" theory, once it had notified Century in August 2000 that the Trustees were asserting the NRD Claim against the District as a PRP, it could, without violating the NVP provisions, take any action without Century's knowledge or consent—including entering into a settlement agreement and settling a lawsuit filed five years later—and Century would nonetheless be required to indemnify the District. This view ignores (and, if accepted, would nullify) the express language of the NVP clauses that prohibited the insured from making voluntary payments without the insurer's consent.

---

[14] The other excess policy at issue (XBC 22358) contained a similar provision.

[15] The four primary insurance policies issued by Century also contained provisions requiring the insured, the District, to provide immediate notice to the insurer in the event of a claim or suit.

32

Further, it disregards the express requirements of the excess (and primary) policies that the District "immediately forward" any lawsuit to Century.

The District argues further, based upon Century's May 31, 2001 response to the tender of the NRD Claim, that Century "elected not to participate in the defense of the NRD Claim; having done so, it lost any contractual right to control the handling of that claim." And elsewhere in its brief, it asserts that "Century refused to defend" the District. These contentions misconstrue the meaning and effect of Century's response to the Claim Notice from the District, are contrary to settled law concerning insurers' obligations under primary and excess third-party liability policies, and do not support the District's "no second notice" argument.

Century's May 31, 2001 letter properly set forth its then-existing obligations with respect to the NRD Claim under the primary and excess insurance policies. The primary insurance policies obligated Century to "defend any suit against the Insured." " 'The duty to defend arises when the insured tenders defense *of the third party lawsuit* to the insurer.' [Citation.]" (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 886, italics added (*Foster-Gardner*).) Century's letter did not constitute a "refus[al] to defend," as urged by the District.

Further, at the time Century sent its May 31, 2001 letter in response to the District's notice of the NRD Claim, the insurer had no duty of indemnification under the excess policies. At that time, there was no lawsuit, let alone a judgment against the insured, that would trigger indemnification under Century's excess policies. (See *Certain Underwriters at of London v. Superior Court* (2001) 24 Cal.4th 945, 961 (*Powerine I*) ["the duty to indemnify is not broad enough to extend beyond 'damages,' i.e., money ordered by a court, but rather is limited thereto"].) As our high court has explained: " '[T]he duty to indemnify "entails the payment of money" [citations]' 'has as its purpose "to resolve liability . . . after liability is established" [citation],' and 'can arise only after damages are fixed in their amount [citations]' [citation]." (*County of San Diego v. Ace*

33

*Prop. & Cas. Ins. Co.* (2005) 37 Cal.4th 406, 417.) Moreover, no indemnity duty had arisen when the District notified Century of the NRD Claim because, of course, there was nothing at the time of the tender to indicate that the primary policies had been or would be exhausted by a money judgment. (See *Fireman's Fund Ins. Co. v. Maryland Cas. Co.* (1998) 65 Cal.App.4th 1279, 1304 (*Fireman's Fund*) [excess policy "provides coverage after other identified insurance is no longer on the risk" and the insurer's " 'liability attaches only after a predetermined amount of primary coverage has been exhausted' "]; see also *Aerojet-General Corp. v. Commercial Union Ins. Co.* (2007) 155 Cal.App.4th 132, 143 [excess insurer had no duty to indemnify where insured and primary carrier settled lawsuit; indemnity coverage by excess insurer was limited to damages, and "the term 'damages' as . . . used in liability insurance indemnity provisions means only money ordered by a court to be paid"].)

It is true that an insurer's wrongful denial of a defense or coverage is a breach of contract, and in such instance, the insured, if it achieves a reasonable settlement of the third-party claim against it may seek reimbursement from the insurer as damages. (*Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791 (*Isaacson*); see also *Jamestown Builders*, *supra*, 77 Cal.App.4th at pp. 347-348 ["a]n insured that has been abandoned by its carrier . . . may protect its own interests by entering into a reasonable settlement without losing its right to recover on the policy"].) But here, there was no wrongful denial of defense or coverage by Century. And—contrary to the District's argument—Century's notification in its May 31, 2001 letter that its obligations for defense and indemnification under the primary and excess policies had not yet ripened did not constitute an "elect[ion] not to participate in the defense of the NRD Claim."

The August 2000 Claim Notice did not excuse the District's obligation to notify Century of the federal action, and it did not negate the applicability of the NVP provisions in the policies.

### 5. *Whether The District's Payments Were Involuntary*

The District also contends that the NVP provisions of the excess policies should not have been enforced because its agreement to settle the NRD Claim as embodied in the Consent Decree (and expenditures made thereafter) were not voluntary. It asserts that the NRD Claim was "not a garden variety claim[]" and that any "choice [the District had] of engaging in negotiations with the Trustees or holding back and refusing to comply until forced [through litigation and judgment] was superficial at best." The District therefore argues that its ultimate agreement to settle the NRD Claim, thereby obligating itself to make substantial expenditures to comply with the Consent Decree, was not a voluntary decision. This argument was rejected by the trial court below.[16]

To be sure, an insured may prevent application of an NVP provision where its payment is made "involuntarily because of circumstances beyond its control[, such as] where the insured is unaware of the identity of the insurer or the contents of the policy [citation, o]r [is] . . . faced with a situation requiring immediate response to protect its legal interests. [Citation.]" (*Jamestown Builders*, *supra*, 77 Cal.App.4th at p. 348; see also *Tradewinds Escrow, Inc. v. Truck Ins. Exchange* (2002) 97 Cal.App.4th 704, 710-712.) Neither situation is applicable here. Here, the District knew Century's identity, and there were no circumstances "requiring immediate response" by the District that compelled it to enter into the Consent Decree without prior notification to, and approval from, Century.

The District relies on *Intel Corp. v. Hartford Acc. & Indem. Co.* (9th Cir. 1991) 952 F.2d 1551 (*Intel*) in support of its assertion that its agreement to settle was not voluntary. The District quotes from *Intel*—in the context of the circuit court of appeals'

---

[16] In holding that the District's action of entering into the Consent Decree was voluntary, the trial court concluded: "[The District] could have provided notice to [Century] prior to entering into the consent decree and that would have given [Century] the option to negotiate or decline to participate. This would have satisfied [the District's] obligations under the NVP provision."

discussion concerning whether environmental cleanup costs undertaken by an insured in a consent decree are damages—the following passage: "Faced with an obligation that it will have to meet, sooner or later, an insured would reasonably expect that, if it acts responsibly and cooperates with government agencies, it will not forego coverage to which it would be entitled if it forced the agencies to expend their resources in filing suit, particularly where cooperation will probably result in compliance at a lower cost to the insured (and thus to the insurer). [Citation.]" (*Id.* at p. 1564.) But the question of whether an NVP provision barred an insured from seeking indemnification for payments voluntarily made was not presented in *Intel*. Moreover, the court of appeals itself concluded that signatories to consent decrees *voluntarily incur the obligations* thereunder. (See *ibid.* ["the insured voluntarily assumed the obligation to conduct cleanup" under consent decree].)

As indicated above, although, as the California Supreme Court has stated, " 'consent decrees bear some of the earmarks of judgments entered after litigation . . . because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts.' [Citation.] *Their 'most fundamental characteristic,' . . . is their 'voluntary nature.'* [Citation.]" (*Aerojet-General*, *supra*, 17 Cal.4th at pp. 66–67, fn. omitted, italics added.) We appreciate the concerns expressed by the District that the potential exposure a potentially responsible party (PRP) faces, including possible litigation under CERCLA, may compel it to negotiate a settlement with the claimants (here, the Trustees), thereby "act[ing] responsibly and cooperat[ing] with government agencies" to attempt to resolve the environmental claim (NRD Claim). (*Intel*, *supra*, 952 F.2d at p. 1564.) But such practical considerations did not render the District's entering into the Consent Decree an involuntary act that would make inapplicable the NVP provision in the excess policies. There was simply no exigency that compelled the District to reach a settlement with the Trustees on its own prior to notifying and seeking approval from Century. (Cf. *Legacy Partners, Inc. v. Travelers*

36

*Indemnity Co. of Illinois* (9th Cir. 2003) 83 Fed.Appx. 183, 190 [citing *Jameson Builders*, *supra*, 77 Cal.App.4th 341, rejecting insured's contention that it was excused from delay in requesting indemnity from insurer because settlement payment was dictated by "economic necessity" and thus involuntary].)

The District also cites *Maryland Cas. Co. v. Wausau Chemical Corp.* (W.D. Wis. 1992) 809 F.Supp. 680 (*Maryland Cas.*) in support of its position that its act of entering into the Consent Decree was not voluntary and that therefore the NVP provisions in the excess policies did not preclude its right to indemnification. In that diversity action, the district court, applying Wisconsin law (*id.* at p. 690), held that the insured's act of obligating itself to take remedial measures under a consent decree rather than subject itself to CERCLA litigation did not bar its right to indemnification under an NVP provision in its policy. (*Id.* at pp. 695-696.) The district court held that the insured's settlement was not voluntary, reasoning: "Although [the insured] did appear to have a choice of engaging in negotiations with EPA or holding back and refusing to comply until forced, this choice was superficial at best. The legislative history of CERCLA provides evidence that the stiff penalties for failure to negotiate with EPA were intended to make the primary force behind cleanup efforts voluntary settlements, rather than drawn-out litigation. [Citation.] To hold that such settlements are 'voluntary' for purposes of an insurance policy exclusion would frustrate the intent of Congress." (*Id.* at p. 696; but see *Augat, Inc. v. Liberty Mut. Ins. Co.* (Mass.1991) 571 N.E.2d 357, 360 [rejecting insured's argument that its settlement was involuntary because it was "presented with a 'Hobson's choice' [of] . . . accept[ing] the settlement [the agency] offered or risk paying treble damages following a suit . . . [the insured] had an alternative—it had the right to demand that [the insurer] defend the claim and assume the obligation to pay for the cleanup"].)

Aside from our disagreement with the *Maryland Cas.* court's characterization of an NVP provision as a policy exclusion (see pt. III.B.3., *ante*), we note that a

distinguishing fact there was that the insured "had attempted for years to obtain coverage from its insurers and notified its insurers of the original Potentially Responsible Party letter." (*Maryland Cas.*, *supra*, 809 F.Supp. at p. 695.) While here, the District did notify Century in August 2000 that the Trustees had identified the District as a potentially responsible party, it did not "attempt[] for years to obtain coverage from [Century]." (*Ibid.*) Further, we believe that finding that an insured's act of entering into a consent decree under the circumstances here is involuntary is at odds with the fact that a consent decree's " 'most fundamental characteristic,' . . . is [its] '*voluntary nature*.' [Citation.]" (*Aerojet-General*, *supra*, 17 Cal.4th at p. 67, italics added; see also *King v. Walters* (7th Cir. 1999) 190 F.3d 784, 788 ["it hardly makes sense to refer to a document as a 'consent' decree when it is based on something other than the parties' voluntary agreement"].) Therefore, we disagree with the holding in *Maryland Cas.* that an insured's settlement without the insurer's consent is not voluntary (and thus the NVP provision of its insurance policy that would preclude indemnification is inapplicable) where the insured enters into a consent decree to avoid a lawsuit under CERCLA. (See *Haynes v. EMC Mortgage Corp.* (2012) 205 Cal.App.4th 329, 335 [California appellate courts "are not bound by federal decisions on matters of state law"].)

The District argues that its execution of the Consent Decree was involuntary because the NRD Claim involving the potential for CERCLA litigation was "not a garden variety claim[]." If the District's execution of the Consent Decree were deemed involuntary, this would essentially transform a prelitigation administrative environmental claim into a lawsuit for purposes of an insurer's defense and indemnity obligations. And at oral argument, counsel for the District urged that because the statutory scheme of CERCLA strongly encourages pre-suit settlement by a PRP, concluding that settlement of such a claim by a consent decree is voluntary would provide disincentive to excess insurance carriers to become involved unless and until a CERCLA lawsuit were filed. These positions asserted by the District are not supported by Supreme Court authority.

38

In *Foster-Gardner*, *supra*, 18 Cal.4th 857, 881, the high court rejected the contention by the insured, an entity against which an environmental claim was asserted, that, in light of the " 'coerciveness' " of the administrative order or notice, the insurer under a CGL policy had the obligation to provide a defense to the insured as if a suit had been filed. The Court concluded that there was no basis for expanding the definition of " 'suit' " under the traditional third-party CGL policy to include "environmental agency notices." (*Ibid.*; see also *id.* at p. 882 ["by specifying that only a 'suit,' not a 'claim,' triggers the duty to defend, insurers have drawn an unambiguous line to define and limit their contractual obligation"].) Likewise, the Supreme Court has held that the insurer owes no duty to indemnify its insured for costs and expenses paid to comply with a resulting administrative order: "[E]xpenses required by an administrative agency pursuant to an environmental statute, whether for the cleanup of a contaminated site and the abatement of the contamination's effects or otherwise, do not constitute money ordered by a court." (*Powerine I*, *supra*, 24 Cal.4th at p. 966.)

Treatment of the District's execution of the Consent Decree here—entered into while a pre-suit environmental claim was being contested and negotiated—as involuntary for purposes of avoiding application of the NVP provisions in the excess policies would effectively create an obligation on the part of Century to indemnify the District for its pre-suit obligation. This would run contrary to the holding in *Powerine I*, *supra*, 24 Cal.4th at page 966.

An NVP provision will be enforced "in the absence of economic necessity, insurer breach, or other extraordinary circumstances. [Citations.]" (*Jamestown Builders*, *supra*, 77 Cal.App.4th at p. 346.) No such economic necessity, insurer breach, involuntariness of the District's actions, or other extraordinary circumstances justified the nonenforcement of the NVP provisions in the excess policies here.

### 6. *Whether Century Is Barred by Equitable Estoppel*

The District argued below that Century was equitably estopped from arguing that the NVP provisions of the excess policies barred the District from seeking indemnification. Its theory of estoppel was that after the District gave notice of the NRD Claim in August 2000, "Century responded [in May 2001] that it had no obligation to indemnify under the subject excess policies unless and until the District could provide documentation that the underlying limits had been exhausted. [Citation.] Based on Century's instructions, it was reasonable for the District to believe that, with regard to the excess policies, Century wished to be informed if and when the underlying insurance had been or was potentially going to be exhausted. This is what the District did when it sent its April 22, 2008 letter. [Citation.] [¶] Century cannot now assert the NVP provision as a forfeiture of coverage based on the District following Century's instructions." On appeal, the District urges that whether equitable estoppel applied here was a question of fact, and that the trial court therefore improperly resolved the issue by summary judgment.

The doctrine of equitable estoppel is based upon " ' "[t]he vital principle . . . that [a person] who by his [or her] language or conduct leads another to do what he [or she] would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he [or she] acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both." ' [Citation.]" (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 488.) "The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he [or she] must intend that his [or her] conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he [or she] must rely upon the conduct to his injury. [Citation.]" (*Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725.) The party asserting the estoppel defense bears the burden of proving its application.

40

(*Busching v. Superior Court* (1974) 12 Cal.3d 44, 53.)  Further, estoppel is shown only if the detrimental reliance was reasonable.  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 35 (*Waller*); see also *Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.)

The substance of the 2001 Century letter cited by the District does not support a claim of equitable estoppel.  In response to the tender of the NRD Claim, Century notified the District on May 31, 2001 that, "since no lawsuit ha[d] been filed," it had no duty to defend the District under the primary policies, advising the District that if it had "documentation that would suggest otherwise," it should supply it to Century.  In the same letter, Century advised that it had no indemnity obligations to the District under the excess policies "unless and until the underlying limits have been exhausted."  Century requested that the District provide documents to Century "[i]f and when" it was "show[n] that the underlying limits have been or will potentially be exhausted . . . [for Century to] determine if and when [its] layers of coverage may be involved."

As discussed above (see pt. III.B.4., ante), contrary to the District's assertions on appeal, the May 31, 2001 letter does not evidence that "Century had refused to defend" the District, or that the correspondence constituted a "declination letter[]."  Rather, the letter reflected two central positions of Century, both of which were accurate.

First, Century, at that time of the August 2000 tender, had no duty to defend the District under the primary policies because no lawsuit had been filed and such suit was required to trigger such duty.  All of the primary insurance policies obligated Century to "defend any suit against the Insured."  " 'The duty to defend arises when the insured tenders defense of the third party lawsuit to the insurer.' [Citation.]  Prior to the filing of a complaint, there is nothing for the insured to *tender defense* of, and hence no duty to defend arises.  It follows therefore that site investigation expenses incurred prior to the instigation of a lawsuit against the insured are not defense costs the insurer must incur. That is because the insurer does not yet have a duty to defend the insured."

41

(*Foster-Gardner, supra*, 18 Cal.4th at p. 886; see also *id.* at p. 879 [policy language referring to duty to defend " 'suits' " could not reasonably be construed as imposing duty on insurer to defend "some precomplaint notices" argued to be "the 'substantive equivalent' of 'suits' "].)

Second, Century, when the August 2000 tender was made, had no duty of indemnification under the excess policies. (See *Powerine I*, *supra*, 24 Cal.4th at p. 961 [insurer's "duty to indemnify [is] . . . limit[ed] to money ordered by a court"].) Further, there was nothing to indicate that the primary policies had been, or would be, exhausted. "In the context of liability insurance, a primary insurer generally has the *primary* duty to defend and to indemnify the insured, unless otherwise excused or excluded by specific policy language. [Citation.] Excess insurance provides coverage after other identified insurance is no longer on the risk. 'Excess' coverage means 'coverage whereby, *under the terms of the policy*, liability attaches only after a predetermined amount of primary coverage has been exhausted.' [Citations.]" (*Fireman's Fund*, *supra*, 65 Cal.App.4th at p. 1304, original italics.)

Century's May 31, 2001 correspondence did not constitute a "refus[al] to defend," a "declination," or an insurer's wrongful denial of a defense or coverage constituting an anticipatory breach of contract. (See *Isaacson*, *supra*, 44 Cal.3d at p. 791.) It was not a statement to the District to the effect that it would not, or did not wish to, participate in the defense or settlement of any lawsuit in the event the PRD Claim ripened into litigation. The correspondence did not state or suggest that—simply because Century's duties of defense or indemnification were not implicated by the PRD Claim as of May 31, 2001—the District, without violating the NVP provisions, was free to negotiate a settlement of the claim without Century's knowledge, participation or consent. And the District presented no other evidence that Century's other communications or conduct induced the District to act in the manner it did: proceeding with the execution of the Consent Decree without Century's consent; permitting the entry of judgment without

42

promptly notifying Century of the filing of the federal action; and expending substantial funds over the course of three years to satisfy its obligations under the Consent Decree before notifying Century of the existence of the Consent Decree, federal action, and expenditure of funds. Furthermore, to the extent the District claimed that Century was estopped to invoke the NVP provisions of the excess policies due to its May 31, 2001 correspondence or other conduct, any alleged detrimental reliance by the District was not reasonable. (*Waller*, *supra*, 11 Cal.4th at p. 35.)

"[T]he existence of an estoppel is generally a question of fact." (*Albers v. Los Angeles County* (1965) 62 Cal.2d 250, 266.) Where, however, the facts are undisputed, the existence of estoppel is an issue of law. (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1315.) Thus, "if no estoppel could exist as a matter of law," it is appropriate to dispose of the defense by summary judgment. (*Munoz v. Kaiser Steel Corp.* (1984) 156 Cal.App.3d 965, 971.)

### 7. *Whether Century Is Barred by Waiver*

In its opposition below, the District made the conclusory argument that "Century waived, or is estopped from asserting, the NVP provision as a defense to coverage." The only other assertion made in the trial court concerning waiver was the District's statement that "[b]y the language in its May 2001 letter, Century waived the right to assert the NVP provision."

On appeal, the District uses the word "waived" or "waiver" three times in its appellate briefs. The District presents no argument concerning waiver being applicable to Century's conduct here other than the following two statements that are entirely conclusory: (1) "By the language in its May 2001 letter, Century waived the right to assert the NVP provision"; and (2) "[t]he trial court erred in granting summary adjudication and summary judgment in light of the evidence supporting the District's claims of waiver and estoppel." An appellant's "conclusory presentation, without pertinent argument or an attempt to apply the law to the circumstances of th[e] case, is

43

inadequate" and the appellate court will accordingly "treat the issue as abandoned and [will] not address it on the merits." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852; see also *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [an appellate court has no obligation to "develop the appellants' arguments for them"].)

Even if the District's waiver argument were not abandoned, the trial court did not err in finding no evidence to support the District's claim that Century waived enforcement of the NVP provisions in the excess policies. " ' "[W]aiver is the intentional relinquishment of a known right after knowledge of the facts." [Citations.] The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver" [citation].' [Citations.] The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right. [Citation.]" (*Waller*, *supra*, 11 Cal.4th at p. 31.) In the insurance context, " 'a waiver exists whenever an insurer intentionally relinquishes its right to rely on the limitations provision. [Citation.]' [Citation.] Whether a waiver has occurred depends solely on the intention of the waiving party. [Citation.]" (*Velasquez v. Truck Ins. Exchange* (1991) 1 Cal.App.4th 712, 722 (*Velasquez*).)

In the May 31, 2001 letter that the District asserted below constituted a waiver of the NVP provisions, Century stated: "We submit this letter reserving all of our rights and defenses in every respect under the terms, conditions, and provisions of the policies and any other policies you may identify, as well as all rights and defenses which may be available in law and equity. Any actions taken by us shall not constitute an admission of liability or an admission of coverage and should not be deemed a waiver of any right to

disclaim liability or coverage."[17]  As the NVP provisions were conditions of the two excess policies, they were embraced by this May 31, 2001 reservation of rights.  Further, although the NVP provisions were conditions, not exclusions, waiver cannot be based upon Century's failure to specifically mention them in the May 31, 2001 letter.  (See *State Farm Fire & Casualty Co. v. Jioras* (1994) 24 Cal.App.4th 1619, 1627, fn. 7 [intent of waiving party must be shown, "and is not established merely by evidence the insurer failed to specify the exclusion in a letter reserving rights"].)  Moreover, since the NVP provisions were not implicated in this instance until four years later (in 2005)—when the District signed the Consent Decree (of which fact Century wasn't aware until 2008)—the May 31, 2001 letter does not support a claim of waiver.  Lastly, when Century *was* advised in 2008 of facts resulting in the potential application of the NVP provisions, it *did* advise the District (in correspondence dated July 3, 2008) that the policies might not provide coverage if the insured "voluntarily made or makes any payment, assumed or assumes any obligation, or incurred or incurs any expense without our [the insurer's] prior consent."

In sum, the District did not present evidence to support a showing of waiver, i.e., that Century intentionally relinquished its rights to invoke the NVP provisions of the two excess policies after it had knowledge of the relevant facts.  (See *Waller*, *supra*, 11 Cal.4th at p. 31.)  "[W]aiver is ordinarily a question of fact but becomes a question of law where the facts can support only one conclusion.  [Citation.]" (*Martinez v. Scott Specialty Gases, Inc.* (2000) 83 Cal.App.4th 1236, 1249.)  Here, the issue of waiver may be, and was, properly resolved by summary judgment because the evidentiary record compelled the conclusion that there was no waiver.  (See *Velasquez*, *supra*, 1 Cal.App.4th

---

[17] In its initial and follow-up letters dated August 31 and September 19, 2000, responding to the District's tender of the NRD Claim, Century made statements nearly identical to the one made in the May 31, 2001 letter.

at p. 722 [summary judgment held proper, in part, because insured failed to present evidence that insurer waived policy limitations clause].)

### C. Summary Judgment Order

The motion for summary judgment was based upon the same arguments presented in the summary adjudication motion. As asserted by Century in this appeal, the motion for summary judgment was "a procedural mechanism to obtain a judgment on all relevant policies and finalize [the] litigation."

The District presents no separate argument on appeal challenging the order granting summary judgment. The issues in the motion for summary judgment were addressed fully in the motion for summary adjudication and the trial court's order granting that motion. There appear to be only three matters relative to the summary judgment order that should be addressed here.

First, since the initial complaint did not embrace the primary liability policies, the summary adjudication motion did not specifically address the potential application of the NVP provisions in such policies. The four primary policies contained NVP provisions with identical language: "The insured shall not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence or accident." This language is substantially the same as the NVP provisions in the excess policies considered in the motion for summary adjudication. Our analysis above concerning the NVP provisions of the two excess policies addressed in the summary adjudication motion is equally applicable here. The District's negotiation and execution of an agreement (the Consent Decree) in which it obligated itself to incur substantial funds to settle the NRD Claim deprived Century of its contractual role as a third-party liability insurer of making the " 'judgment call' " concerning the " 'decision to pay any remediation costs outside the civil action context.' " (*Pitzer College*, *supra*, 8 Cal.5th at p. 108.) The District thereby violated the basic tenet of an NVP provision that

46

"insureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability." (*Jamestown Builders*, *supra*, 77 Cal.App.4th at p. 346.) And, as we have concluded above, the fact that the District's settlement with the Trustees took the form of a consent decree does not alter the conclusions that it was (1) a "mutual" agreement" to settle a third-party claim (*Aerojet-General*, *supra*, 17 Cal.4th at p. 67) made without the consent of the insurer; and (2) was voluntarily made by the District (see *ibid.* [the " 'most fundamental characteristic' " of consent decrees "is their 'voluntary nature' "]). Therefore, the NVP provisions in the primary policies applied to preclude indemnification for the District's voluntary assumption of liability under the Consent Decree and its payments made to comply with those obligations.

Second, the motion for summary adjudication did not address the third excess policy, XBC 22050. That excess policy did not contain an NVP provision. The excess policy (XBC 22050), like the other excess policies (XBC 22333 and XBC 22358), provided coverage only for "ultimate net loss in excess of the retained limit." And like the excess policies embraced by the summary adjudication motion, excess policy XBC 22050 defined " '[u]ltimate net loss' [as] the sum actually paid or payable in cash in the settlement or satisfaction of losses for which [the District] is liable either by adjudication or compromise with the written consent of [Century], . . ." As we have discussed (see pt. III.B.3., *ante*), there was no "ultimate net loss" here. Unquestionably, there was no "compromise with the written consent of [Century]." Moreover, the sums paid or payable arose out of the District's voluntary settlement as embodied in the Consent Decree; the obligation was not the result of an "adjudication," i.e., from "[t]he process of judicially deciding a case." (Black's Law, *supra*, at p. 52, col. 1.) And the Consent Decree was not an "adjudication" in the sense that it was "submitted to the trial court for its consideration in deciding a substantive matter in that action. [Citations.]" (*Mercury Interactive*, *supra*, 158 Cal.App.4th at p. 91.) Rather, "it [was] the agreement

of the parties, rather than the force of the law upon which the complaint was . . . based, that create[d] the obligations embodied in [the] [C]onsent [D]ecree.'  [Citation.]" (*Aerojet-General*, *supra*, 17 Cal.4th at p. 67, fn. omitted.)  As was true with respect to the two excess policies addressed in the prior summary adjudication motion, because the Consent Decree was neither a compromise with Century's written consent nor an "adjudication," it did not satisfy the definition in the excess policy (XBC 22050) for "ultimate net loss" for which coverage was provided.

Third, the summary judgment motion also attacked the viability of the second cause of action of the first amended complaint for breach of good faith covenant.  The first cause of action for breach of the insurance policies was properly disposed of in favor of Century by summary judgment.  The breach of good faith covenant claim likewise failed.  (See *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 663 ["[b]ecause there was no breach of contract, there was no breach of the implied covenant"].)

The trial court did not err in granting Century's motion for summary judgment.

## IV.    DISPOSITION

The judgment of August 7, 2019, entered on the order granting summary judgment is affirmed.  Respondent shall recover its costs on appeal.

48

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
DANNER, J.

_____
WILSON, J.

*Santa Clara Valley Water District v. Century Indemnity Company*
**H047394**

Trial Court:                                    Santa Clara County Superior Court
                                                Superior Court No.:  CV286500


Trial Judge:                                    The Honorable Thomas E. Kuhnle



Attorneys for Defendant and Appellant           Bowles & Verna LLP
Santa Clara County Water District:              Robert I. Westerfield






Attorneys for Plaintiff and Respondent          O'Melveny & Myers LLP
Century Indemnity Company.:                      Richard B. Goetz
                                                Zoheb P. Noorani

                                                Aiwasian & Associates
                                                Armen K. Hovannisian

**Santa Clara Valley Water District v. Century Indemnity Company**
**H047394**